IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

JORDAN POLANSKY,

     Plaintiff,

v.

MICHAEL KELLY, an individual,
and SPORTS CAR CLUB OF
AMERICA, INCORPORATED, a
Connecticut Corporation,

     Defendants.                    Case No. 10-cv-680-DRH

<u>ORDER</u>

HERNDON, Chief Judge:

This case arose out of a solo autocross[1] accident which resulted in plaintiff Jordan Polansky being injured after being struck by the vehicle driven by defendant Michael Kelly while plaintiff was acting as a corner captain[2] during Kelly's course run in the parking lot of the Gateway International Raceway. As a result, plaintiff sued Kelly for negligence and the event organizer, defendant Sports Car Club of America, Inc. (Sports Car Club), for wilful and wanton

---

[1]An autocross event is an event generally held on a paved, flat surface, wherein the course typically consists of straight sections and connecting turns or corners, generally resembling a miniaturized road course. Generally one automobile at a time is timed over a clearly defined course, with elapsed time and appropriate penalties for course deviations being the determining factor for awards.

[2]Plaintiff described the role of the corner captain as being responsible for communicating timing and scoring (drivers lose points for hitting cones on the course) and for stopping the race if an unsafe condition arises.

conduct. Both Sports Car Club and Kelly have filed motions for summary judgment (Docs. 84 & 85), arguing that the "release and waiver of liability, assumption of risk and indemnity agreement" (the release and waiver) signed by plaintiff bars his claims and that plaintiff cannot establish any wanton and willful misconduct. The Court agrees, and grants defendants' motions for summary judgment.

## I. Background

Plaintiff is an experienced autocross racer, having participated in approximately thirty-two or thirty-three autocross events since 2003, including two or three events organized by Sports Car Club. Prior to each race, plaintiff was required to sign a release and waiver of liability before he was able to participate. The event causing plaintiff's injuries was no different, and on March 4, 2010, when plaintiff arrived at the Gateway International Raceway to participate in Sport's Car Club's autocross event, he signed the release and waiver at issue which provided as follows:

**RELEASE AND WAIVER OF LIABILITY,**
**ASSUMPTION OF RISK AND INDEMNITY AGREEMENT**
(READ CAREFULLY BEFORE SIGNING)

IN CONSIDERATION of being permitted to compete, officiate, observe, work for, or participate in any way in any Sports Car Club of America or SCCA Pro Racing ("SCCA") events or activities (EVENTS) or being permitted to enter for any purpose any RESTRICTED AREA hereof (defined as any area requiring special authorization, credentials, or permission to enter or any area to which admission by the general public is restricted or prohibited), I, for myself, my personal representative, heirs and next of kin:

1.  Hereby acknowledge, agree, and represent that I will immediately upon entering of any such RESTRICTED AREAS, and will continuously thereafter, inspect the RESTRICTED AREAS which I enter and I further agree and warrant that, if at any time, I am in or about the RESTRICTED AREAS and I feel anything to be unsafe, I will immediately advise the officials of such and will leave the RESTRICTED AREAS and will refuse to participate further.  I understand that the nature of the EVENT may not permit me to inspect the RESTRICTED AREAS and/or EVENT course and facilities (including adjacent areas thereof) with which I may contact during the EVENT prior to my participation and that there may be risks not known to me that are not foreseeable at this time. I agree that, if at any time, I feel anything to be UNSAFE, I will immediately take all necessary precautions to avoid the unsafe area and REFUSE TO PARTICIPATE further in the EVENT.

2.  Hereby RELEASE, WAIVE, and DISCHARGE SCCA, the promoters, participants, racing associations, sanctioning organizations or any affiliate, subsidiary or subdivision thereof, track operators, track owners, officials, car owners, drivers, pit crews, rescue personnel, any person in any RESTRICTED AREA, sponsors, advertisers, owners, and lessees of premises used to conduct the EVENTS, premises and event inspectors, surveyors, underwriters, consultants, and others who give recommendations, directions, or instructions or engage in risk evaluation or loss control activities regarding the premises or EVENTS and for each of them, their directors, officers, agents, and employees, all for the purposes herein referred to as "RELEASEES," FROM ALL LIABILITY TO ME, my personal representatives, assigns, heirs, and next of kin FOR ANY AND ALL LOSS OR DAMAGE AND ANY CLAIM OR DEMANDS THEREFOR ON ACCOUNT OF INJURY TO THE PERSON OR PROPERTY OR RESULTING IN THE DEATH OF THE UNDERSIGNED ARISING OUT OF OR RELATED TO THE EVENTS, WHETHER CAUSED BY THE NEGLIGENCE OF THE RELEASEES OR OTHERWISE.  In addition, I COVENANT NOT TO SUE any of the RELEASEES based upon any claim arising out of any of the EVENTS.

3.  Hereby ASSUME FULL RESPONSIBILITY FOR ANY RISK OF BODILY INJURY, DEATH OR PROPERTY DAMAGE arising out of or related to the EVENTS whether caused by the NEGLIGENCE OR RELEASEES or otherwise.

4.  Hereby AGREE TO INDEMNIFY AND SAVE AND HOLD
HARMLESS the RELEASEES and each of them from any loss,
liability, damage, or cost they may incur due to claims brought
against the RELEASEES arising out of my injury, or death, or
damage to my property while I am in the RESTRICTED AREAS
and/or while competing, practicing, officiating, observing or working
for or for any purpose participating in the EVENTS and whether
caused by the negligence of the RELEASEES or otherwise.

5.  Hereby acknowledge that THE EVENTS ARE POTENTIALLY
VERY DANGEROUS and involve the risk of serious injury and/or
death and/or property damage.  I also expressly acknowledge that
INJURIES MAY BE COMPOUNDED OR INCREASED BY
NEGLIGENT RESCUE OPERATIONS OR PROCEDURES BY THE
RELEASEES.

6.  Hereby agree that this Release and Waiver of Liability, Assumption
of Risk and Idemnity Agreement extends to all acts of negligence by
the RELEASEES, INCLUDING NEGLIGENT RESCUE OPERATIONS
and is intended to be as broad and inclusive as is permitted by the
laws of the Province or State in which th EVENTS are conducted and
that if any portion thereof is held invalid, it is agreed that the balance
shall, not withstanding, continue in full legal force and effect.

I HAVE READ THIS RELEASE AND WAIVER OF LIABILITY,
ASSUMPTION OF RISK AND INDEMNITY AGREEMENT, FULLY
UNDERSTAND ITS TERMS, UNDERSTAND THAT I HAVE GIVEN
UP SUBSTANTIAL RIGHTS BY SIGNING IT, AND HAVE SIGNED IT
FREELY AND VOLUNTARILY WITHOUT ANY INDUCEMENT,
ASSURANCE, OR GUARANTEE BEING MADE TO ME AND INTEND
MY SIGNATURE TO BE A COMPLETE AND UNCONDITIONAL
RELEASE OF ALL LIABILITY TO THE GREATEST EXTENT
ALLOWED BY LAW.

After signing the release and waiver,[3] although plaintiff claims he did

---

[3]In fact, plaintiff had signed the exact same waiver form at a prior Sports
Car Club event and even worked the entry booth at a prior Sports Car Club event,
where he handed out the waiver forms to participants for signatures prior to
letting them in the event.  He knew what he signed was a release and waiver, "what
he was giving up," and knew the event he was about to participate in could be
dangerous and that racing can lead to serious injury and death.

not read it, plaintiff had his car inspected and then walked the course "[a]t least three, maybe four" times, including once with a group.  During his walks, plaintiff noticed that it was wet that day but did not report that nor any other unsafe conditions to any Sports Car Club officials.  Following the group walk-through, a driver meeting was held where things such as "[k]eeping the car under control, what responsibilities you have as a course worker, [and] what to do if you see what you believe to be an unsafe condition" were discussed.  Thereafter, plaintiff was given a work assignment as a corner captain for the third of four runs that day.  Because plaintiff had participated in two to three other events hosted by Sports Car Club, he knew that he was required to work the course in order to drive it, although he did not know what job he would be assigned.  Two other corner workers were assigned to corner three with plaintiff.  Of the three persons assigned to the particular corner, plaintiff was the most experienced, which caused plaintiff to believe resulted in his assignment as the captain. Plaintiff had worked the corner in many races before, having participated in thirty-two or more previous races.   Plaintiff was given a red flag that could be used to stop the race and a radio that was connected to the race starter, timekeeper, and other corner captains.

Plaintiff drove in the second run without incident.  During the third run, plaintiff along with his two co-corner workers reported to the third corner work station to perform their duties.  The work station was

designated by a numbered cone and which had a fire extinguisher.  The third corner work station was located approximately fifty feet from the course.  There was a concrete barrier in plaintiff's corner, which he could have positioned himself behind for protection, but chose not to do so. While acting as corner captain, plaintiff noticed Kelly's vehicle was out of control and coming towards him.  Plaintiff ran backwards in an attempt to avoid Kelly's vehicle, but did not succeed and was struck by Kelly's vehicle, causing plaintiff injuries.  The other two corner workers were also struck by Kelly's vehicle.

## II.  Standard of Review

This case was removed to federal court based upon diversity jurisdiction. In a diversity case, the Court applies state law to substantive issues. *RLI Ins. Co. v. Conseco, Inc.*, 543 F.3d 384, 390 (7th Cir. 2008).  Federal law governs procedure.  *Fednav Int'l Ltd. v. Cont'l Ins. Co.*, 624 F.3d 834, 838 (7th Cir. 2010).  When neither party raises a conflict of law issue in a diversity case, as is the case here, the applicable law is that of the state in which the federal court sits. *Id*.  Thus, Illinois law applies.

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. PROC. 56(c).  A genuine issue of material fact exists when the evidence is such that a

reasonable jury could find for the nonmovant. *Buscaglia v. United States,* 25 F.3d 530, 534 (7th Cir. 1994). The movant in a motion for summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact by specific citation to the record; if the party succeeds in doing so, the burden shifts to the nonmovant to set forth specific facts showing that there is a genuine issue of fact for trial. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). In considering motions for summary judgment, a court construes all facts and draws all inferences from the record in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).

### III.  Analysis

As mentioned previously, plaintiff filed suit against Kelly for negligence and against Sports Car Club for wanton and willful conduct. The Court will consider Kelly's motion for summary judgment first, followed by Sports Car Club's motion.

*A.  Plaintiff's Negligence Claim*

Kelly argues that summary judgment should be granted in his favor because the waiver and release is enforceable. As support, Kelly relies primarily upon two Illinois appellate court cases: 1) *Platt v. Gateway Int'l Motorsports Corp.*, 351 Ill. App. 3d 326, 332 (Ill. App. Ct. 2004); and 2) *Koch v. Spalding*, 174 Ill. App. 3d 692, 697 (Ill. App. Ct. 1988). Plaintiff contends that summary judgment is inappropriate as plaintiff did not contemplate the risks involved as a corner captain prior to the March 14, 2010, event, and the release and wavier is ambiguous on its face. Plaintiff too primarily relies on *Platt* in support of his

Page 7 of 26

position.

"The racing of automobiles at a high speed in limited areas gives rise to various situations which have resulted in the death or injury to drivers, mechanics and spectators at these events." *Schlessman v. Henson*, 83 Ill. 2d 82, 86 (Ill. 1980). "These accidents may occur because of factors involving mechanical failures, defective design of guardrails, driver error or weather conditions affecting driving surfaces." *Id.* "In sum, a myriad of factors, which are either obvious or unknown, may singly or in combination result in unexpected and freakish racing accidents." *Id.* The liability of the parties involved in many of these accidents often, as it does in this case, revolve around agreements to limit liability entered into by the parties. "In Illinois, a party may contract to avoid liability for its own negligence. *Oelze v. Score Sports Venture, LLC*, 401 Ill. App. 3d 110, 117 (Ill. App. Ct. 2010).

"The primary objective in construing a contract is to give effect to the intention of the parties involved." *Platt*, 351 Ill. App. 3d at 329. "The intention of the parties must be ascertained from the language employed in the instrument." *Id.* "A contract is to be construed as a whole, giving meaning and effect to every provision thereof, if possible, because it is presumed that every clause in the contract was inserted deliberately and for a purpose." *Id.* "Where the contract is clear, its interpretation is a question of law to be determined only from the terms of the contract." *Id.* at 330.

"A contract is ambiguous where the language employed is susceptible to

more than one reasonable meaning or obscure in meaning through indefiniteness of expression." *Id.* "A contract is not rendered ambiguous merely because the parties do not agree on its meaning." *Id.* "Whether a contract is ambiguous is a also a question of law." *Id.*

"An exculpatory agreement constitutes an express assumption of risk wherein one party consents to relieve another party of a particular obligation." *Id.* "Although exculpatory agreements are not favored and will be strictly construed against the benefiting [sic] party, [citation], parties may allocate the risk of negligence as they see fit, and exculpatory clauses do not violate public policy as a matter of law." *Id.*

"An exculpatory clause, to be valid and enforceable, must contain clear, explicit, and unequivocal language referencing the type of activity, circumstances, or situation that it encompasses and for which the plaintiff agrees to relieve the defendant from a duty of care." *Id.* "Exculpatory agreements have been upheld in the auto racing context where an injured driver or participant has brought suit against an owner or operator of a raceway." *Id.* "The foreseeability of a danger is an important element of the risk a party assumes and will often define the scope of an exculpatory agreement." *Id.* at 331. "The plaintiff must be put on notice of the range of dangers for which he assumes the risk of injury, enabling him to minimize the risks by exercising a greater degree of caution." *Id.* "The precise occurrence that results in injury need not have been contemplated by the parties at the time they entered into the contract." *Id.* "It should only appear that the

injury falls within the scope of possible dangers ordinarily accompanying the activity and, thus, reasonably contemplated by the plaintiff." *Id.*

In *Platt*, the plaintiff, a tobacco company employee in charge of public relations attended various race car races as part of his job, including defendant race organizer's races. Prior to attending these races, the defendant had the plaintiff sign a release and waiver, excluding it as well as most everyone else associated with the organizer's events from liability for injuries arising out of or related to the "events." The waiver and release stated that it extended to all acts of negligence by the releasees and was intended to be as broad and inclusive as permitted by law.

In May of 1998, the plaintiff was working at the defendant organizer's racing event. The plaintiff's base of operations was a media trailer located on the infield of the racetrack, which the plaintiff was required to cross to enter or exit. On May 22, 1998, prior to some qualifying rounds, the racetrack was being circled by several tow trucks traveling between 55 to 70 miles in order to dry the track, a standard practice in the auto racing industry. After being signaled to cross by a racetrack employee, the plaintiff exited the infield by driving across the racetrack and collided with a tow truck. Thereafter, plaintiff brought suit against several defendants, including the race organizer and tow truck driver, alleging negligence and willful and wanton conduct.

The circuit court granted summary judgment in favor of the defendants on the negligence claim because the plaintiff had signed an agreement exculpating the

defendants from liability; plaintiff appealed.  On appeal, the plaintiff argued that the exculpatory agreement did not bar his negligence allegations against the defendants because the term "event" in the exculpatory agreement was ambiguous and because the parties did not contemplate the risks involved.  The appellate court disagreed.

First, the Court found that the term "event" was not ambiguous but clear and explicit, finding that the contract as a whole was broad and inclusive and barred liability for negligence claims "'arising out of or related to the event(s),' caused not only by 'participants, racing associations, *** car owners, drivers, [and] pit crews' but also by 'promoters, organizers, [and] any persons in any restricted areas.'" *Platt*, 351 Ill. App. 3d at 330.  Thus, because the two trucks were preparing for the event, plaintiff's resulting negligence claim arose out of or was related to an event, regardless of whether a race was in progress.  *Id.* at 330-31.

As to the plaintiff's argument that the parties did not contemplate the risks involved, the appellate court disagreed, finding that the record revealed that plaintiff had been involved in automobile racing for years and that he had signed similar agreements prior to entering restricted areas of the racetracks.  *Id.* at 332. The court noted that the parties were aware that the common practice to dry a track for auto racing consisted of tow trucks driving at high speeds around the track, and that the parties were aware that the plaintiff must cross the racetrack to reach his base of operations.  *Id.*  The court stated, "[b]y adopting the broad

language employed in the exculpatory agreement, the parties contemplated the similarly broad range of accidents that occur in auto racing." *Id.* The court further found that while the parties may not have contemplated the precise occurrence that resulted in the plaintiff's accident, that did not render the exculpatory agreement inoperable. *Id.* Accordingly, the court of appeals affirmed the circuit court's decision to grant summary judgment. *Id.* at 332-33.

Here, *Platt* supports granting summary judgment in Kelly's favor. Unlike in *Platt*, the parties do not dispute that the event that occurred in this case would not be covered by the waiver and release. Rather, plaintiff focuses his argument on the fact that he believes the waiver and release did not contemplate plaintiff working as a corner captain and points out that the term "work" was not defined in the waiver and release. Plaintiff's focus on the "term" work, however, is misplaced. Here, like in *Platt*, the release and waiver is not ambiguous but clear and explicit. In fact, the term "work for" is only mentioned once in the waiver and release and it is clear that the term "work" is one of several verbs that could describe plaintiff's activities. The relevant provision provides that "IN CONSIDERATION of being permitted to compete, officiate, observe, work for, or participate in any way in any [Sports Car Club] events or activities (EVENTS), or being permitted to enter for any purpose any RESTRICTED AREA hereof (defined as any area requiring special authorization, credentials, or permission to enter or any area to which admission by the general public is restricted or prohibited)" plaintiff agreed to "RELEASE, WAIVE, and DISCHARGE [Sports Car Club], the

promoters, participants, racing associations, sanctioning organizations or any affiliate, subsidiary or subdivision thereof, track operators, track owners, officials, car owners, drivers, pit crews, rescue personnel, any person in any RESTRICTED AREA, sponsors, advertisers, owners, and lessees of premises used to conduct the EVENTS, premises and event inspectors, surveyors, underwriters, consultants, and others who give recommendations, directions, or instructions or engage in risk evaluation or loss control activities regarding the premises or EVENTS and for each of them, their directors, officers, agents, and employees, all for the purposes herein referred to as 'RELEASEES,' FROM ALL LIABILITY TO ME . . . ." Further, plaintiff agreed to "ASSUME FULL RESPONSIBILITY FOR ANY RISK OF BODILY INJURY, DEATH OR PROPERTY DAMAGE arising out of or related to the EVENTS whether caused by the NEGLIGENCE OF RELEASEES or otherwise." The end the agreement stated that "I HAVE READ THIS RELEASE AND WAIVER OF LIABILITY, ASSUMPTION OF RISK AND INDEMNITY AGREEMENT, FULLY UNDERSTAND ITS TERMS, UNDERSTAND THAT I HAVE GIVEN UP SUBSTANTIAL RIGHTS BY SIGNING IT, AND HAVE SIGNED IT FREELY AND VOLUNTARILY WITHOUT ANY INDUCEMENT, ASSURANCE, OR GUARANTEE BEING MADE TO ME AND INTEND MY SIGNATURE TO BE A COMPLETE AND UNCONDITIONAL RELEASE OF ALL LIABILITY TO THE GREATEST EXTENT ALLOWED BY LAW."

These provisions clearly contemplated plaintiff participating as a corner captain, either by being permitted to "compete, observe, work for, or *participate*

*in any way* in any [Sports Car Club] events or activities, or being permitted to enter for any purpose any RESTRICTED AREA . . . ." (Emphasis added). Plaintiff not only competed but also clearly participated in any way in the race and was permitted to enter a restricted area. By doing so, plaintiff released, waived, and discharged, among others, the "car owners" and "drivers" like Kelly from liability for injuries he sustained arising out of or related to the event. See *Platt*, 351 Ill. App. 3d at 330-31. Moreover, like the plaintiff in *Platt*, plaintiff had been involved in automobile racing for years and had signed similar agreements, including the same agreement, prior to entering restricted areas of the racetracks. See *id.* at 332. Furthermore, just as the plaintiff in *Platt* was aware that two trucks would be used and that he would have to cross the racetrack, plaintiff was aware that he would be required to participate in some fashion during the other course runs. *Id.* And while the parties may not have set forth the precise task plaintiff would be asked to perform, the broad language in the waiver and release clearly contemplated the task of acting as a corner captain, an integral and ordinary part of the event that plaintiff was aware of. See *id.* The waiver and release here put plaintiff on notice of the range of dangers for which he assumed the risk of injury and being struck by a race car clearly falls within the scope of possible dangers ordinarily accompanying participating in auto races. See *id.* at 331.

*Koch* further supports this conclusion. In *Koch*, the plaintiff arrived at the racetrack to act as a flagman for the automobile races that were to be conducted that evening. Upon arrival, the plaintiff entered the pit shack and was given a

track release and waiver of liability form which the plaintiff signed.  The form was similar to the waiver and release at issue in this case.  The plaintiff then left the pit shack to undertake his duties as a flagman.  As the plaintiff was shutting down the first set of "hot laps," the last car on the track lost control and struck the plaintiff.  The plaintiff brought suit for his injuries and the appellate court agreed to review whether a release and waiver of liability executed by the plaintiff was a bar to the plaintiff's cause of action for negligence.

The appellate court began by setting forth that an exculpatory agreement may be set aside if there is either fraud in the inducement or fraud in the execution of the agreement.  *Koch,* 174 Ill. App. 3d at 697.  "Fraud in the execution occurs where the party was induced to sign the agreement not knowing it was a release but believing it to be another type of document, while fraud in the inducement is where the party is induced to enter into the release by false representations by the other party."  *Id.*  There, the court found that the facts asserted in the certified question of law did not establish plaintiff was induced to execute the release and waiver of liability through fraud.  *Id.*  Specifically, the court found, among other things, that the record revealed that the plaintiff had been involved in automobile racing for ten years; that the plaintiff had signed similar agreements prior to entering restricted areas of other racetracks; that while the plaintiff admitted that he did not read the exculpatory agreement, he was not prevented from doing so prior to signing it; that the plaintiff admitted that he knew the word "release" meant that the racetrack was not liable should an

accident occur; and that the document itself was clearly captioned it was a release and waiver of liability. *Id.* The court concluded that these facts should have alerted the plaintiff as to the nature of the document, and that the facts alleged did not indicate that the plaintiff was fraudulently induced to execute the release. *Id.* Further, the court found that the language of the release clearly barred an action for negligence against the promoter defendant. *Id.*

Similarly to *Koch*, in this case, plaintiff was an experienced autocross racer, having participated in over thirty races over the span of approximately seven years; plaintiff had signed similar, if not identical, exculpatory agreement for every other racing event he had participated in, including distributing the forms and requiring signatures before admittance during at least one of the events; that while plaintiff claims he did not read the release, he admitted that he knew it was a waiver and release; that plaintiff understood he was giving up something by signing the waiver and release; and that plaintiff saw that it was a waiver and release prior to signing. Even more than in *Koch*, plaintiff admitted during his deposition that he understood the risks involved in autocross racing, that he was given a wristband to signify he signed the release, and that he had worked as a regular non captain corner worker quite a few times before at other races.

While plaintiff does not specifically claim fraud in the execution or fraud in the inducement in signing the waiver and release, both of those theories are belied by the record as plaintiff admitted that although he did not read the release and waiver, he knew it was a waiver and release that he was signing and plaintiff does

not claim that he was induced to enter into the release by false representations, but rather admits that he did not have to participate and could have left at any time given the risks. *Koch,* 174 Ill. App. 3d at 697; see also *Schlessman*, 83 Ill. 2d at 87 ("While it is obvious that plaintiff would not have been allowed to use the racetrack had he not signed the release, plaintiff was under no economic or other compulsion to sign the release in order to engage in amateur auto racing . . . ."); *Melena v. Anheuser-Busch, Inc.*, 219 Ill. 2d 135, 150 (Ill. 2006) ("[A] party to an agreement is charged with knowledge of and assent to the agreement signed."); *Oelze,* 401 Ill. App. 3d at 117 (finding that plaintiff's signing of the release barred her negligence claims despite her claim that she did not know it was a release and did not read it because "a party has a general duty to read documents before she signs them, and her failure to do so will not render the document invalid."); *Breckenridge v. Cambridge Homes, Inc.*, 246 Ill. App. 3d 810, 819 (Ill. App. Ct. 1993) ("A party who had an opportunity to read a contract before signing, but signs before reading, cannot later plead lack of understanding."). For all of these reasons, summary judgment is granted in favor of Kelly.

### B. Plaintiff's Wanton and Willful Conduct Claim

Sports Car Club contends that summary judgment should be granted because plaintiff's allegations of wrongful conduct exposed him to a risk that was contemplated by plaintiff and waived by him prior to his participation in the solo autocross event, and because plaintiff has failed to establish facts that substantiate his claims of willful and wanton conduct. Plaintiff contends that

summary judgment is inappropriate as a matter of law because there is a genuine issue of material fact as to whether the direct violation of the rules and guidelines of the National Sports Car Club of America as contained in the 2010 edition of the National Solo Rules (the Rules) by Sports Car Club resulted in willful and wanton conduct resulting in plaintiff being injured.[4]

Exculpatory clauses will be upheld in the absence of willful and wanton conduct. *Oelze,* 401 Ill. App. 3d at 117; *Masciola v. Chi. Metro. Ski Council*, 257 Ill. App. 3d 313, 317 (Ill. App. Ct. 1993); *Beaver v. Grand Prix Karting Assoc., Inc.*, 246 F.3d 905, 912 (7th Cir. 2001).  "Willful and wanton conduct is found where an act was done with actual intention or with a conscious disregard or indifference for the consequences when the known safety of the other persons was involved."  *Burke v. 12 Rothschild's Liquor Mart, Inc.*, 148 Ill. 2d 429, 451 (Ill. 1992) (internal quotations omitted).  The Illinois Supreme Court has previously defined "willful and wanton misconduct" in the following terms:

> A wilful and wanton injury must have been intentional or the act must have been committed under circumstances exhibiting a reckless disregard for the safety of others, such as a failure, after knowledge of impending danger, to exercise ordinary care to prevent it or failure to discovery the danger through recklessness or carelessness when it could have been discovered by the exercise of ordinary care.

*Am. Nat'l Bank & Trust Co. v. City of Chi.*, 192 Ill. 2d 274, 285 (Ill. 2000)

---

[4]Plaintiff also argues in his response to Sports Car Club's motion for summary judgment that questions of material fact exist as to whether the waiver clearly explained and included the circumstances in which plaintiff would be assigned a role of corner worker.  This argument has been addressed above.

(quoting *Ziarko v. Soo Line R.R. Co.*, 161 Ill. 2d 267, 273 (Ill. 1994)).  "The party doing the wanton act or failing to act 'must be conscious of his conduct, and, though having no intent to injure, must be conscious, from his knowledge of the surrounding circumstances and existing conditions, that his conduct will naturally and probably result in injury.'" *Oelze*, 401 Ill. App. 3d at 122-23 (quoting *Bartolucci v. Falleti*, 382 Ill. 168, 174 (Ill. 1943)).  "The knowledge concerning other persons can be actual or constructive." *Tagliere v. Springs Park Dist.*, 408 Ill. App. 3d 235, 242-43 (Ill. App. Ct. 2011) (quoting *Winfrey v. Chi. Park Dist.*, 274 Ill. App. 3d 939, 944-45 (Ill. App. Ct. 1995)).  "[I]n general, '[w]hether conduct is "willful and wanton" is ultimately a question of fact for the jury.'" *Murray v. Chi. Youth Ctr.*, 224 Ill. 2d 213, 245 (Ill. 2007) (quoting *Doe v. Calumet City*, 161 Ill. 2d 374, 390 (Ill. 1994)).  Nevertheless, "[i]n some circumstances, it is necessary for the court to decide as a matter of law whether the plaintiff's complaint alleges sufficient facts of a defendant's willful and wanton conduct to create a jury question." *Murray*, 224 Ill. 2d at 245.

In his amended wanton and willful conduct count, plaintiff does not contend that Sports Car Club acted with actual intention.  Thus, plaintiff's theory is that Sports Car Club acted "with a conscious disregard or indifference for the consequences when the known safety of the other persons was involved." *Burke*, 148 Ill. 2d at 451 (internal quotations omitted).  This claim primarily hinges on the Court's interpretation of the Rules applicable to Sports Car Club's racing events.  Specifically, plaintiff points to Rule 2.2M which provides as follows:

Participants and non-participants must be kept at a safe distance from the course, particularly at the outside of turns and at the start and finish lines.  Unless protected by substantial barriers, non-participant areas must be roped off.  The Solo Safety Steward shall have the authority to set minimum viewing distances from the course but such minimum viewing distances may not be less than 75 feet from the course edge in unprotected areas (areas without adequate barrier protection such as concrete or tire walls).

Appendix E of the Rules defines "participant" as "[a] driver, crewmember, worker or guest or any other individual who has signed the waiver is a 'participant.'" And while "non-participant" is not defined, that term is used in the definition of "spectator" which "is defined as any non-participant or one not signing the waiver."  Thus, a "participant" is an individual who has signed the waiver and a "non-participant" is an individual who has not signed a waiver or a "spectator."[5]  Here, there is no question that plaintiff was a "participant," first as a driver and second as a worker.

Plaintiff contends that because an investigation following the accident revealed that plaintiff was struck sixty-one feet from the course without any barriers, Sports Car Club has violated the Rules and "[f]ailed to set such minimum viewing distances from the course of seventy-five (75) feet from the courses edge in an unprotected area" and "[f]ailed to mandate that [plaintiff], and

---

[5]This is supported by the introduction section of Appendix E of the Rules which provides as follows: "There are two groups of people that attend our events, non-participants and participants.  Non-participants are those individuals that have not signed the SCCA waiver and participants are those individuals that have signed the waiver.  The words 'Non-Participant' and 'Spectator' can be interchangeable, as can be the words "Participant" and Driver, Worker, Crew or Guest."

other corner captains and course workers stay at least seventy-five (75) feet from

the courses edge in unprotected areas during the autocross events."  Plaintiff

contends that Sports Car Club's Rules violation creates a genuine issue of

material fact as to whether Sports Car Club engaged in willful and wanton

conduct that resulted in plaintiff being injured.

The first problem with plaintiff's argument is that the Rule 2.2M does not

apply to plaintiff when acting as corner captain.  Rather, the seventy-five feet

minimum viewing distance applies to non-participants or spectators, not to

participants who are actually participating in the event, such as the drivers,

crewmembers, and workers.  This is corroborated by all of the evidence presented

to the Court.  For example, Janice Rick, the safety steward for the Midwest

division for the National Sports Car Club of America, testified in his deposition

that the seventy-five feet setback provision did not apply to workers because they

were not viewing the race but rather were working it.  He noted it would be

impossible for a corner captain to do his job of picking up cones that were

knocked over if the individual was required to be seventy-five feet away from the

course.  Similarly, Tom Cindrich, a course designer for Sports Car Club who

helped design the course at issue, testified that the seventy-five foot rule did not

apply to participants who were workers.  He pointed out that it would be

impossible for the individual working as the "starter" to perform his or her duties

seventy-five feet away.  Kelly Smith, chief course designer for Sports Car Club who

designed the course at issue in this case and helped set it up, also testified that

the seventy-foot rule did not apply to corner captains.  The same was testified to

by Lynn Wilson, a licensed safety steward, and David Schardhorst, a Sports Car

Club of America committee member.  Sports Car Club has met its burden of

establishing no genuine issue of material fact for trial, and plaintiff has failed to

shift the burden by setting forth specific facts showing that there is a genuine

issue of fact for trial, FED. R. CIV. P. 56(c); *Celotex Corp.,* 477 U.S. at 325, despite

the Court construing all facts and drawing all inferences from the record in favor

of plaintiff.  *Anderson,* 477 U.S. at 255.   Moreover, plaintiff can hardly look to the

theory that defendant failed to provide him with sufficient protection of open

space and distance when he was provided with concrete barriers for protection

and failed to avail himself of that protection.

        Plaintiff points the Court to *Oelze*, 401 Ill. App. 3d 110, and *Downing v.*

*United Auto Racing Assoc*., 211 Ill. App. 3d 877 (Ill. App. Ct. 1991) (abrogated on

other grounds by *Burke*, 148 Ill. 2d 429), to try and convince the Court otherwise.

In *Oelze*, the appellate court reversed the circuit court's decision to grant

summary judgment in favor of the defendant tennis club on the plaintiff member's

willful and wanton count despite the fact that the plaintiff had signed a waiver and

release indemnifying the defendant from liability.  In that case, the plaintiff was

injured while playing tennis after her foot was caught in a rope ladder located

right behind the heavy, black, floor-to-ceiling curtain at the back of the tennis

court when she attempted to make a play.  On appeal, the plaintiff asserted that

"defendant's conduct was willful and wanton because, with superior knowledge of

the equipment in its facility, it exhibited a conscious indifference to the safety of others by placing the ladder, which is unrelated to the game of tennis and unlikely to be anticipated by a tennis player, in a concealed area creating a tripping hazard trap or by allowing it to be placed there." *Oelze*, 401 Ill. App. 3d at 123.

The court agreed, finding that the fact the defendant knew that placing an object on the floor closely behind the curtain, hidden from the view of tennis players using the court, created a dangerous hidden tripping hazard, and that the defendant endeavored to eliminate this danger by trying to avoid having an object closer than two feet from the curtain, but the defendant's efforts failed. *Id.* at 123-24. Therefore, the court concluded that "a question of fact regarding whether defendant's efforts to prevent the danger caused by the errant ladder failed due to inadvertence or due to a reckless disregard for the safety of others" existed for the trier of fact to decide. *Id.* at 124.

The case here is distinguishable from *Oelze*. First, despite plaintiff's assertions to the contrary, Sports Car Club did not fail at an endeavor to eliminate a danger it sought to eliminate. Instead, the evidence shows that the identical course design and course worker positioning utilized on the date of plaintiff's accident had been used on two prior occasions without incident, once in dry weather and once in heavy, continuous rain. Indeed, the record reflects that the course design at issue was selected and approved by Sports Car Club because the design and worker positioning had proved to be safe and reliable in wet pavement conditions. Thus, the evidence fails to show that Sports Car Club acted

"with a conscious disregard or indifference for the consequences when the known safety of the other persons was involved." *Burke*, 148 Ill. 2d at 451.  Sports Car Club did not fail, after knowledge of impending danger, to exercise ordinary care to prevent it or did not fail to discover the danger through recklessness or carelessness when it could have been discovered by the exercise of ordinary care. *Am. Nat'l Bank & Trust Co.*, 192 Ill. 2d at 285.  To the contrary, Sports Car Club acted in compliance with the procedures it had set forth to try and avoid any injury.  Unfortunately, a freak accident occurred and plaintiff was injured, but there is no genuine issue of material of fact with regard to whether Sports Car Club engaged in wanton and wilful conduct.  The record simply shows otherwise.

*Downing* is also distinguishable from the case at hand.  In *Downing*, the plaintiff, a member of a pit crew, was injured when a race car driver's vehicle flipped over and skid toward the pit area where the plaintiff was standing, striking the plaintiff.  The plaintiff contended that the defendant race association and organizer "were guilty of willful and wanton conduct because they (1) failed to extend the guardrail near the pit area and (2) failed to provide a pit steward to ensure that persons did not remain in the exposed area near the pit." *Downing*, 211 Ill. App. 3d at 832.  The case went to trial and the jury returned a verdict against defendants.

On appeal, the defendants argued that the jury's finding of willful and wanton misconduct was not supported by the evidence in the record, and that the trial court should have granted their motion for judgment notwithstanding the

verdict, or, in the alternative, motion for a new trial.  *Id.* at 883.  The appellate court disagreed, finding that a review of the record revealed a sufficient basis to justify the jury's verdict.  *Id.* at 884.  The court relied upon the testimony of the plaintiff's expert testimony which established that defendants "were aware that the exposed area near the pit presented a substantial risk of serious injury to persons who stood there, and that defendants knew pit crew members were often located in the vicinity during warm-up and hot laps,"and "that in his opinion, the defendants' failure to extend the guardrail, or require the presence of a pit steward, was an utter disregard for the safety of pit crew members."  *Id.* at 884-85.  Based upon this, the court could not "say, as a matter of law, that this evidence was insufficient to prove that defendants' omissions constituted willful and wanton conduct."  *Id.* at 885.

Here, plaintiff has not presented the court with any expert testimony that Sports Car Club's conduct was wanton or willful.  In fact, the evidence in the record is questionable whether Sports Car Club's conduct was even negligent, but nothing in the record supports an inference that Sports Car Club's conduct was wanton and wilful.  Thus, summary judgment in Sports Car Club's favor is appropriate under these circumstances.  See *Randle v. Hinckley Parachute Ctr., Inc.*, 141 Ill. App. 3d 660, 662-63 (Ill. App. Ct. 1986) (upholding the trial court's granting of  summary judgment on the plaintiff's wanton and willful claim after plaintiff was injured during his landing while skydiving where the alleged errors and omissions of the defendant did not amount to wilful and wanton misconduct,

but rather were at most "a few negligent omissions" which were "clearly covered by the exculpatory agreement."); compare *Simpson v. Bryon Dragway, Inc.*, 210 Ill. App. 3d 639, 649-50 (Ill. App. Ct. 1991) (affirming the trial court's order denying summary judgment on the plaintiff's willful and wanton counts where the deposition testimony created a question of fact regarding whether the defendant racetrack's failure to take precautionary measures to prevent animals from entering the track constituted willful and wanton negligence where it was apparent that the defendant racetrack knew that dogs and deer had been sighted near the racetrack on at least two occasions prior to the accident where the plaintiff's dragster collided with a deer after the dragster crossed the finish line).

## IV. Conclusion

For the reasons stated above, the Court grants Kelly's motion for summary judgment (Doc. 85) and Sports Car Club's motion for summary judgment (Doc. 84). Both defendants filed counterclaims against plaintiff seeking a judgment against plaintiff equal to the cost of defense. Those claims remain pending as neither of the motions decided herein addressed the issues raised in the counterclaims.

**IT IS SO ORDERED.**

Signed this 6th day of March, 2012.

David R. Herndon
2012.03.06
16:57:22 -06'00'

**Chief Judge**
**United States District Court**